**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

KACEM M. ANDALIB,

       Plaintiff,

v.

JBS USA, LLC, d/b/a JBS SWIFT & COMPANY;
RIGO MENDIOLA, in his individual and official capacities; and
ANTHONY RICKOFF, in his individual and official capacities,

       Defendants.

---

### COMPLAINT AND JURY DEMAND
---

     Plaintiff Kacem M. Andalib, by and through counsel, Eudoxie (Dunia) Dickey of CIVIL

RIGHTS & EMPLOYMENT LAW ADVOCATES, LLC, respectfully alleges for his Complaint

and Jury Demand as follows:

### I.      INTRODUCTION

     1.     This is an action against JBS USA, LLC, d/b/a JBS Swift & Company ("JBS" or

the "Company"), Anthony ("Tony") Rickoff, the Manager of JBS's Human Resources

Department (HR) for the JBS Greeley Beef Plant and Rigo Mendiola, the Director of HR for the

JBS Greeley Beef Plan, for religion, race, color, ethnicity, ancestry, alienage and/or national

origin discrimination, failure to promote and hostile work environment; retaliation; and

outrageous conduct by Defendant Rickoff.

1

2.      Plaintiff, a Human Resources Supervisor (HR), was the only Muslim, only Arab and Berber and only employee of Moroccan national origin in an HR department otherwise comprised primarily of white and Latino employees.  He successfully worked at JBS from October 2014 until his wrongful termination by Defendant JBS on April 11, 2018.  Plaintiff was highly qualified and fluent in English, French, Spanish, Arabic and Moroccan, excelled in performing his demanding duties as the only HR Supervisor on duty on the "B" Shift, which runs from approximately 3:15pm until approximately 11:45pm, until Defendant Rickoff joined the HR department as a trainer in approximately winter or spring of 2017.  Soon thereafter, Defendant Rickoff, a non-Muslim, white, American male, began to brazenly discriminate against Plaintiff on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin. On one such occasion, he blamed Plaintiff and other Muslim employees, including but not limited to Arab and Berber ethnicities and Moroccan, Somali, Sudanese and other African origin, for the recently enacted Muslim Ban.  Defendant Rickoff outrageously accused Plaintiff that "It's all your fault, you freaking terrorists!", suggesting that Plaintiff, a U.S. citizen, and his fellow co-workers were terrorists merely by virtue of his and their perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and leaving Plaintiff in shock and disbelief and causing him deep emotional distress. When Plaintiff made a verbal complaint to Defendant Mendiola, the HR Director, regarding Defendant Rickoff's offensive and derogatory statement, rather than investigating, taking any corrective action or disciplining Defendant Rickoff, upon information and belief, he instead informed Defendant Rickoff of Plaintiff's complaint. Shortly thereafter, Defendant Mendiola failed to promote the highly-qualified and experienced Plaintiff to HR Manager, and instead promoted the less qualified and less experienced Defendant Rickoff, a white American non-Muslim male.

Defendant Mendiola wrongfully failed to promote Plaintiff in retaliation for having protested Defendant Rickoff's discrimination and in doing so, tolerated, ratified and rewarded Defendant Rickoff's discrimination against Plaintiff and other JBS employees on the basis of his and their perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.

      3.     Now that he had been promoted to HR Manager and became Plaintiff's direct supervisor, Defendant Rickoff immediately initiated a campaign of retaliation against Plaintiff. Defendant Rickoff consistently treated Plaintiff like a second-class citizen, singled him out for belittling, derogatory, denigrating and humiliating treatment and repeatedly sabotaged and set Plaintiff up for failure with the goal of getting him in trouble with Defendant Mendiola. When Plaintiff finally made a formal written email complaint to Defendant Mendiola regarding Defendant Rickoff's discrimination and retaliation, Defendant Mendiola failed to respond. A few days later, he forwarded Plaintiff's complaint to corporate and told him to speak with them. Aside from calling Plaintiff in for an interview with the corporate office, Defendants failed to meaningfully investigate, discipline or take any corrective action whatsoever with respect to Defendant Rickoff. Plaintiff never heard back from anyone at JBS regarding the results of any purported investigation, no one at JBS provided him with any written or verbal investigatory findings at any time nor did Plaintiff receive any indication that this purported investigation resulted in any corrective action or discipline with respect to Defendant Rickoff. Defendant Mendiola, a Latino non-Muslim male, also treated Plaintiff less favorably than all his HR colleagues, who were primarily non-Muslim white and Latino employees, denying him the tools he needed to succeed and advance at the Company, including but not limited to a much-needed laptop, access to HR software required for the job as well as numerous opportunities for training despite Plaintiff's repeated requests. By the winter of 2018, Defendant Mendiola began

completely ignoring Plaintiff's requests and concerns altogether and consistently stopped replying to Plaintiff's emails.  Plaintiff was the only employee in the HR department without a laptop who was denied these valuable tools and opportunities.

4.     Effectively, Defendants allowed discrimination and retaliation against Muslims, Arabs and Berbers and employees of Moroccan, Somali or other African national origin to grow and fester in the heart of the very highest levels of its very own Human Resources department, which ironically is ultimately tasked with promulgating, enforcing and training employees on the Company's equal opportunity and anti-discrimination policies; addressing employee grievances and complaints respecting discrimination and retaliation; and disciplining the responsible employees.  In doing so, JBS was sending the message loud and clear to the entire JBS Greeley Beef Plant that regardless of any paper policies, harassment, discrimination and retaliation against Muslims of all ethnicities and national origins was the Company's standard operating procedure and would be not only tolerated, but as in Defendant Rickoff's case, sometimes even rewarded.  Defendant Rickoff certainly got the message that he could continue to brazenly discriminate against Plaintiff without any negative repercussions or fear of discipline.  On one occasion he boasted to Plaintiff that by firing a Muslim, Somali employee, he was "doing his share of making America great again!" and on another occasion he shockingly told Plaintiff and another Muslim, Arab and Berber employee of Moroccan national origin "If you're going to speak that blah-blah-blah, do it in Africa!" upon overhearing them conversing in Moroccan, their native language.  Unfortunately, none of this is surprising in light of Defendant JBS's demonstrated, long-standing custom, policy and practice of discrimination and retaliation against Muslims, Arabs and Berbers and employees of Moroccan or African national origin, among others, at the JBS Greely Beef Plant and other JBS facilities.

5.      Acting pursuant to Defendant JBS's long-standing, established custom, policy and practice of discrimination and retaliation against employees in these protected categories, Defendants Rickoff and Mendiola ultimately succeeded in terminating Plaintiff on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and in retaliation for his protected complaints regarding this discrimination and retaliation. Defendant Mendiola fabricated a vague and subjective disciplinary write-up – *the first ever of Plaintiff's entire career* – and shortly thereafter Defendant Rickoff made false accusations against Plaintiff in order to get him fired.  Defendants justified Plaintiff's termination with this fabricated disciplinary record, which was merely pretext for illegal discrimination and retaliation on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.

6.      Defendants' actions have caused Plaintiff severe economic and non-economic damages.

## II.      JURISDICTION AND VENUE

7.      This action arises under the Constitution and laws of the United States and the State of Colorado, and is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Colorado common law.

8.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

### III. ADMINISTRATIVE PREREQUISITES

10.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and has received his Notice of Right to Sue.  Thus, all administrative prerequisites have been met.

### IV.      PARTIES

11.      Plaintiff Kacem M. Andalib is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Plaintiff Kacem Andalib was employed by JBS USA, LLC d/b/a JBS Swift & Company and its related corporate entities.

12.      Defendant JBS USA, LLC, d/b/a JBS Swift & Company ("JBS" or the "Company") is a Delaware corporation, with a principal street address of 1770 Promontory Circle, Greeley, Colorado 80604.  JBS USA, LLC, d/b/a JBS Swift & Company is a private wholly-owned subsidiary of JBS USA Co. Holdings, Inc., also a Delaware corporation, which in turn is a private wholly-owned indirect subsidiary of JBS S.A., a Brazilian company that is the world's largest processor of beef and pork. Defendant JBS USA, LLC, d/b/a JBS Swift & Company owns and operates the JBS Greeley Beef Plant, which is located at 800 North 8th Avenue, Greeley, Colorado 80631.

13.      Defendant Rigo Mendiola is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Rigo Mendiola was employed by JBS.

14.     Defendant Anthony Rickoff is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Anthony Rickoff was employed by JBS.

## V.     FACTUAL ALLEGATIONS

### *Plaintiff, The Only Muslim, Arab and Berber And Only Moroccan In The JBS Greeley Beef Plant Human Resources Department, Was An Outstanding, Successful And Dedicated Employee At JBS For Nearly Four Years*

15.     Plaintiff was an outstanding, successful and highly qualified employee who was initially hired at the JBS Greeley Beef Plant in October 2014 as a Trim Operations Supervisor and shortly thereafter earned a promotion to a management position within the HR department as a Supervisor on the B Shift.  In this capacity, Plaintiff was a highly dedicated employee who worked extraordinarily hard, coming in at 3pm and regularly staying past 1am and often past 2am or 3am.  Plaintiff often worked on Saturdays and came in whenever he was needed.  For nearly four years, he excelled in this role, contributing his educational background in Agricultural Economics and World Food Distribution from Prairie View A&M University, his prior professional experience in the meat production industry, and his impressive multilingual skills, cultural savvy and conflict-resolution abilities to successfully managing and resolving complex employee issues, grievances and labor relations as the only HR Supervisor on the B Shift at a meat production plant with approximately 3,300 employees.  Plaintiff's impressive fluency in English, Spanish, French, Arabic and Moroccan proved an invaluable asset to the Company for managing employee relations at the JBS Greeley Beef Plant among its diverse, multinational and multilingual workforce which collectively speaks approximately thirty-six (36) languages.  Among other honors, Plaintiff earned a place on the University Honor Roll at Prairie View A&M University every semester, was a member of the National Honor Society and

graduated with a 4.0 GPA; earned a Beef Quality Assurance Honor at Texas A&M University; earned an International Hazard Analysis Critical Control Point (HACCP) Food Safety Certificate in 2014; completed the Dale Carnegie "Strictly Business" Training in 2014 and earned a Family Medical Leave Act (FMLA) Compliance Certificate in 2017.  Plaintiff earned this FMLA Compliance Certificate while at JBS in order to develop professionally and gain the skills he needed to advance at the Company.  Unfortunately, despite his desire and repeated requests to attend other trainings so he could grow professionally, this FMLA compliance training was the only training opportunity that Defendant Mendiola permitted Plaintiff to attend, as discussed below.

16.     Plaintiff always earned satisfactory performance reviews and he earned accolades from his colleagues, one of whom described Plaintiff as "[d]etail-orientated, perfectionist, plans, prioritizes… seeks a deep understanding of things, gets things right and [c]ompletes the base responsibilities for his current role."  Another colleague praised his ownership and commitment to his job in the following glowing terms:

> [Plaintiff] is very engaged in the organizations [sic] culture. He takes ownership of his department and his work, attempting to make decisions that benefit the big picture. He is highly energetic and personable, and passionate about his work.

17.     Until Defendants Rickoff and Mendiola joined forces to fabricate a pretextual justification which they could use to justify terminating Plaintiff in retaliation for his protected complaints of discrimination and retaliation, he never received a single disciplinary write-up or any corrective action during his nearly four-year tenure at JBS, and in fact in his entire professional career.

***Defendant Rickoff Outrageously Labeled Plaintiff And His Fellow Muslim Workers Of Every Race, Ethnicity And Nationality "You Freaking Terrorists"***

8

18.     On or about April 28, 2017, Plaintiff was casually discussing the effects of the Trump Administration's recently-enacted Muslim Ban with Defendant Rickoff, a white American non-Muslim male who at that time was a trainer who had recently joined the HR department.  Plaintiff observed that the Muslim Ban would likely hurt the Company's business because so many of the beef workers at JBS's Greeley Beef Plant were of Somali or Sudanese national origin and now might be unable to return to work following trips to visit family back in their countries of origin.

19.     In a stunning response, Defendant Rickoff immediately retorted "It's all your fault, you freaking terrorists!", raising the strong implication that merely by virtue of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, Plaintiff was a "freaking terrorist", which in light of the United States' ongoing War against Terror, suggested Defendant Rickoff believed he posed a dangerous threat to national security – presumably along with all of his Muslim, Arab, Berber, Moroccan, Somali, Sudanese and other African colleagues.  Plaintiff was so stunned, bewildered and distressed by Defendant Rickoff's degrading insult that he was unable to reply.  To Plaintiff's mind, Defendant Rickoff's assault on his status as an immigrant and American citizen were all the more harmful and insidious in the context of the current charged political climate and epitomized the very definition of hate speech, which is defined as "speech that is intended to insult, offend or intimidate a person because of some trait (as race, religion,… national origin…)" by the Merriam-Webster dictionary.

***Plaintiff Made A Verbal Complaint To HR Director Defendant Mendiola, The Human Resources Director, Protesting Defendant Rickoff's Outrageous "You Freaking Terrorists!" Religious, Racial and/or Xenophobic Epithet***

20.     Shocked and horrified by Defendant Rickoff's outrageous suggestion that he, a proud American citizen who happened also to be a Muslim, Arab and Berber originally from

Morocco, was a "freaking terrorist" merely by virtue of the immutable characteristics of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, Plaintiff went to speak with Defendant Mendiola, the HR Director, several days later.  During their meeting on or about May 3, 2017, Plaintiff made a verbal complaint in protest of Defendant Rickoff's derogatory and inflammatory words and pleaded with Defendant Mendiola to investigate this incident and take appropriate corrective action.  Defendant Mendiola assured Plaintiff that he would look into the matter and get back to him.  Neither he nor anyone else at Defendant JBS ever did.

***Defendants JBS and Mendiola Entirely Failed to Investigate, Reprimand Or Take Any Corrective Action Whatsoever With Respect To Defendant Rickoff, Thereby Tolerating, Ratifying and Rewarding His Discriminatory Conduct***

21.     Instead of investigating this disturbing incident as he had assured Plaintiff he would, upon information and belief, Defendant Mendiola instead informed Defendant Rickoff that Plaintiff had made a complaint against him.

22.     Defendants JBS and Mendiola, who as the Human Resources Director for the entire JBS Greeley Beef Plant was not only in the best position to know but also had the ultimate responsibility for promulgating, training and enforcing the Company's anti-discrimination and equal opportunity policies, failed abjectly in his and their duty to investigate, discipline or take any corrective action with respect to Defendant Rickoff.  In his total failure to do so, Defendants Mendiola and JBS tolerated, ratified and rewarded Defendant Rickoff's verbal assault and harassment of Plaintiff on the basis of Plaintiff's and other JBS employees' perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.

23.     Unfortunately, Defendants JBS's and Mendiola's complete failure to remedy discrimination and harassment against Plaintiff and other JBS employees on the basis of his and

their perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin *at the highest levels of its own HR department* reflects Defendant JBS's standard operating procedure and is in line with JBS's long-standing, demonstrated history and custom, policy and practice of discrimination, retaliation, harassment and hostile work environment against its Muslim, Arab, Somali, Sudanese and other minority employees, which the Company has clearly failed to remedy, as discussed below.  At all times relevant to this Complaint, Defendants Mendiola and Rickoff acted pursuant to Defendant JBS's standard operating procedure of discrimination and retaliation against employees from these and other protected groups.

***In Retaliation For Plaintiff's Protected Complaint, Defendant Mendiola Passed Him Over For Promotion And Promoted The Less-Qualified And Less Experienced Defendant Rickoff Instead, And Thus Rewarded His Discrimination and Harassment Against Plaintiff***

24.     Immediately following Plaintiff's verbal complaint protesting offensive workplace discrimination, Defendants Rickoff and Mendiola began a vicious campaign of retaliation and further discrimination against him in an (ultimately successful) effort to push him out of the Company.

25.     On or about May 5, 2017, Plaintiff applied for the position of HR Manager, which had recently become available.

26.     Defendant Mendiola made an intentional choice to reward and ratify Defendant Rickoff's discriminatory conduct against Plaintiff and other Muslims by promoting Defendant Rickoff, whom he elevated to HR Manager, installing him as Plaintiff's direct supervisor in approximately July 2017.  Defendant Mendiola made this decision not to promote the more qualified and more experienced Plaintiff in retaliation for his protest of Defendant Rickoff's discrimination.  In fact, Defendant Mendiola did not even give Plaintiff an opportunity to interview for the position and adding insult to injury, did not bother to even inform him that the

post had been filled.  Plaintiff later learned of Defendant Rickoff's promotion from other HR colleagues, whom Defendants Mendiola and/or Rickoff had already informed that the position had been filled.

27.     As a successful Human Resources Supervisor with several years' experience in HR at the JBS Greeley Beef Plant with an educational and professional background in food production and an extensive multilingual proficiency in English, French, Spanish, Arabic and Moroccan, Plaintiff had proved an invaluable asset to managing the Company's diverse multinational and multilingual workforce. With an educational and professional background in food production and nearly four years' demonstrated successful experience in the JBS HR department, he undoubtedly was more qualified for the HR Manager position than Defendant Rickoff, who lacks any language abilities other than English and had only recently joined the HR Department.

28.     By elevating Defendant Rickoff to HR Manager, Defendant Mendiola established him as Plaintiff's direct supervisor and intentionally placed him in a position of authority over the man whom Defendant Mendiola was fully aware had very recently verbally assaulted him as a "freaking terrorist" on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.

***Immediately Upon Becoming Plaintiff's Direct Supervisor, Defendant Rickoff Began Criticizing, Belittling, Humiliating, Micromanaging, Undermining And Setting Plaintiff Up For Failure In Retaliation for Plaintiff's Protest Of His Discrimination***

29.     Now that he was ensconced as Plaintiff's direct supervisor, Defendant Rickoff felt newly empowered to retaliate against Plaintiff for having protested Defendant Rickoff's discrimination.

30.     Defendant Rickoff immediately began criticizing, belittling, humiliating, micromanaging, undermining, and making petty, pretextual complaints against Plaintiff in an effort to set him up for failure and disciplinary action beginning in the summer and fall of 2017.

31.     Starting the very next day after Plaintiff protested Defendant Rickoff's discrimination to Defendant Mendiola, Defendant Rickoff immediately began treating Plaintiff less favorably than his non-Muslim, primarily white and Latino HR colleagues[1] on a daily basis. Defendant Rickoff went out of his way to treat Plaintiff like a second-class citizen by ordering him around, dismissing and denigrating his accomplishments while praising his colleagues, keeping him out of the loop on important information he needed to perform his duties and setting him up for failure.

32.     Defendant Rickoff's efforts to undermine Plaintiff with the goal of ultimately driving him out of the Company in retaliation for his protected complaint against him came to a head during an incident on or about October 10, 2017. That afternoon, a Spanish-speaking employee named Victor Casia Baquiax from the Fleshers department was brought into the HR office on an employee matter and subsequently needed to return to the Fleshers department for the B Shift. Because Plaintiff speaks Spanish, he immediately learned from Mr. Baquiax that this employee worked in the Fleshers department. However, Defendant Rickoff insisted that Mr. Baquiax worked in the Fabrication department although Plaintiff repeatedly indicated to him that Mr. Baquiax actually needed to go back to the Fleshers department. Ignoring Plaintiff, Defendant Rickoff called Hassane Boudi, a Superintendent in the Fabrication Department who

_____

[1] Upon information and belief, the HR department also included one African-American employee. Defendants treated Plaintiff less favorably than *all* his HR colleagues, including this employee and the white and Latino employees.

worked on the B Shift, and asked him to come to the HR office to escort Mr. Baquiax to

Fabrication.  Following Defendant Rickoff's orders, Mr. Boudi promptly did so.

33.     When it soon became apparent that Mr. Baquiax in fact was a member of the

Fleshers department, as Plaintiff had explained to Defendant Rickoff, Defendant Rickoff sent

Plaintiff an email falsely accusing *him* of taking Mr. Baquiax to the Fabrication department and

directing him to bring Mr. Baquiax to the Fleshers department – all the while knowing it was his

own decision to send the employee in question to the wrong department.  Plaintiff reminded

Defendant Rickoff via email that he had informed Defendant Rickoff that this employee needed

to return to Fleshers rather than Fabrication department, and noting that Defendant Rickoff was

the one who made the call to request Mr. Boudi to escort Mr. Baquiax from HR to the wrong

department.

34.     Despite knowing full well that he alone was responsible for this error, and rather

than acknowledging his error and handling the situation himself, Defendant Rickoff responded

by copying Defendant Mendiola, everyone involved and even members of the Safety Department

who had nothing to do with this incident, absolving himself of any responsibility for his own

erroneous decision to send the employee to the wrong department and instead suggesting that

Plaintiff was at fault in an unmistakable attempt to throw Plaintiff under the bus in the eyes of

Defendant Mendiola and other colleagues and set him up for discipline.  Defendant Rickoff

wrote, in part, "I'm not sure where you took [Mr. Baquiax] after you left HR. I believe you took

him to fabrication[,]" which he clearly knew was false.

35.     This attempt by Defendant Rickoff to undermine Plaintiff in the eyes of

Defendant Mendiola and other colleagues was just one of numerous such incident which together

over time amounted to a pattern in which Defendant Rickoff singled out Plaintiff – the only

Muslim, Arab and Berber of Moroccan national origin in the HR department – for discrimination and retaliation in the months following Plaintiff's protest of his discrimination.

***Understanding That Defendant Rickoff Was Retaliating Against Him, Plaintiff Made A Formal Written Complaint Regarding His "You Terrorists" Hate Speech And His Subsequent Discrimination And Retaliation; Once Again, Defendants Mendiola & JBS Failed To Meaningfully Investigate, Discipline Or Take Any Corrective Action With Respect To Defendant Rickoff***

36.     Correctly recognizing Defendant Rickoff's attempts to set Plaintiff up for disciplinary action as retaliation, on or about October 10, 2017, Plaintiff made a written complaint to Defendant Mendiola with regard to Defendant Rickoff's having called him a "freaking terrorist[]" as well as his ongoing efforts to undermine, belittle, and set Plaintiff up for failure, including but not limited to the October 10, 2017 incident involving Mr. Baquiax. Plaintiff again pleaded with the HR Director to help put an end to Defendant Rickoff's retaliation and discrimination, writing, in part, "I have already submitted a complaint about being called a terrorist by [Defendant] Rickoff because of my Muslim background and now I have to suffer more mistreatment because he was appointed as a manager over me?  I am seeking your help to put an end to this discrimination."

37.     Upon receiving Plaintiff's written complaint, Defendant Mendiola failed to reply to Plaintiff's email at all and did not even mention the matter for several days.  Instead of conducting a fulsome investigation himself and finally putting a stop to Defendant Rickoff's harassment, discrimination and retaliation against Plaintiff, as was presumably his duty as the Human Resources Director, Defendant Mendiola directed Plaintiff to speak with corporate.

38.     Defendant Mendiola forwarded Plaintiff's written complaint to the JBS corporate department, whereupon on or about October 26, 2017 Plaintiff was called into an interview with Briana Cole, the JBS Head of Compliance, to discuss his complaint.  After a brief and cursory

conversation, Ms. Cole indicated to Plaintiff that Defendant Mendiola "will get back with you." Instead, Defendant JBS either conducted a sham investigation or failed to investigate at all, made no findings and again failed to discipline or counsel Defendant Rickoff.  Once again, Defendants JBS and Mendiola continued to tolerate and ratify Defendant Rickoff's discriminatory and increasingly harassing, retaliatory treatment of Plaintiff.  Plaintiff never did hear back from Ms. Cole, Defendant Mendiola nor anyone else at JBS regarding his written complaint, was never informed of any investigatory findings nor did he receive any indicated that any corrective action or discipline was taken with respect to Defendant Rickoff.  Defendant Rickoff's subsequent harassment, humiliation and further retaliation against Plaintiff certainly suggested otherwise, as discussed below.

### *Defendant Mendiola Engaged In His Own Discrimination And Retaliation Against Plaintiff And Treated Him Less Favorably Than His White And Latino Colleagues*

39.     Following Plaintiff's verbal and written complaints protesting Defendant Rickoff's discrimination and retaliation against him, Defendant Mendiola discriminated and retaliated against Plaintiff in his own right and treated him less favorably than all his HR colleagues, who were primarily white and Latino.

40.     Defendant Mendiola denied Plaintiff's repeated requests for a work laptop and access to the Company's people management software, leaving Plaintiff – the only Muslim, Arab and Berber and the only employee of Moroccan national origin in the HR Department – alone among his peers without access to a laptop or the software he needed to successfully perform his job responsibilities.

41.     When Martha Holstein, a non-Muslim, white American HR Supervisor and Plaintiff's peer, requested a work laptop later that year on or about November 21, 2018, Defendant Mendiola promptly granted her request.

42.     However, when Plaintiff once again entreated Defendant Mendiola for a work laptop just a week later on or about November 30, 2017, Defendant Mendiola completely ignored his reasonable request even though Plaintiff explained to him in an email that "I really need a [l]aptop, it is almost a necessity as I spend a big part of my shift in the floor and fab[rication] office and do not have access to a computer there.  It will also be a big help with ASSIST and other programs that we are trying to enforce." When Plaintiff followed up on his request in person, Defendant Mendiola curtly told him "no."

43.     Defendant Mendiola also repeatedly ignored and denied Plaintiff's requests to attend professional trainings and conferences, which his non-Muslim, non-Arab and non-Moroccan peers were permitted to attend.

44.     For example, in the same email, Plaintiff reminded Defendant Mendiola that he was still very interested in attending a worker's compensation training, which he had previously asked Defendant Mendiola to attend.  Defendant Mendiola likewise ignored this request.  As just another example, a few months later on or about February 7, 2018, Plaintiff implored Defendant Mendiola to attend a payroll training, which Defendant Mendiola once again ignored.  When Plaintiff later again asked Defendant Mendiola regarding these and other opportunities in person, Defendant Mendiola dismissed his request and told him "no."  Defendant Mendiola instead permitted Plaintiff's non-Muslim, non-Arab and Berber and non-Moroccan peers to attend these and other trainings and conferences and avail themselves of other opportunities for professional development.

45.     In these and numerous other ways, Defendant Mendiola treated Plaintiff less favorably than his non-Muslim, primarily white and Latino colleagues, denied him the tools he

needed to succeed in his position, opportunities for professional development and stymied

Plaintiff's eagerness to advance at the Company.

***Following Plaintiff's Formal Written Complaint, Defendant Rickoff Redoubled His Campaign Of Retaliation And Escalated His Harassment of Plaintiff***

46.     In concert with Defendant Mendiola, Defendant Rickoff redoubled his efforts to

undermine, belittle, criticize, harass, humiliate and otherwise find ways to get Plaintiff in trouble

after Plaintiff made a written complaint against him and spoke with the JBS Corporate

department regarding Defendant Rickoff's "you freaking terrorists!" comment and his

subsequent discrimination and retaliation, including but not limited to the October 10, 2017

incident involving Mr. Baquiax.

47.     Shortly after Plaintiff spoke with corporate, Defendants brought in a non-Muslim,

white American employee, Martha Holstein, to the HR Department as a Supervisor. Soon after,

Defendant Rickoff began to groom Ms. Holstein to ultimately replace Plaintiff after he had

succeeded in fabricating enough of a disciplinary record to serve as a pretextual justification to

terminate Plaintiff.

48.     Plaintiff shared an office with Ms. Holstein, who worked during the earlier "A"

Shift. At some point in the winter of 2017-2018, Plaintiff began finding his work files, notes and

other items had been moved from his desk to a desk at the back of the office. Being forced to sit

in the back was inconvenient for Plaintiff because as the only HR professional without access to

a laptop, he needed to sit at the front desk which was the only desk fitted with a desktop.

Moreover, sitting with his back facing the office door also posed a safety hazard for Plaintiff

because of the unpredictable nature of workers at the plant particularly on the B Shift, when

Plaintiff was the only HR Supervisor on duty.  Although Plaintiff repeatedly asked Ms. Holstein

to refrain from moving his work items to the back of the office, Ms. Holstein indicated to him

that Defendant Rickoff, her direct supervisor, had specifically instructed her to remove Plaintiff's items from his desk and relegate them to the back of the office.  In ways large and small, Defendant Rickoff consistently treated Plaintiff like a second-class citizen and singled him out for less favorable treatment vis-à-vis his non-Muslim and primarily white and Latino colleagues as part of a continuing pattern of discrimination on the basis of Plaintiff's perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and in retaliation for having made protected complaints protesting this discriminatory conduct.

49.     Defendant Rickoff also began cruelly denigrating, belittling and humiliating Plaintiff in front of his colleagues.  In one such instance, Plaintiff was indisposed and in the middle of using the bathroom when Defendant Rickoff called him on his cellphone. Since he was in the bathroom stall, he was unable to answer his phone, but he called Defendant Rickoff just back a few minutes later.  Defendant Rickoff ordered Plaintiff to come to a meeting in the Safety Office, which he promptly did.  Upon arriving at the Safety Office, Defendant Rickoff stood up and proceeded to publicly interrogate Plaintiff as to his whereabouts, loudly asking him "where were you?" and "we've been looking for you!" in front of a group of seven or eight employees assembled from various departments.  At this point, Plaintiff was briefly called out of the meeting to attend to a pressing employee issue. When he returned to the meeting in the Safety Office a few minutes later, Defendant Rickoff waited until everyone had quieted down and stood back up, looked directly at Plaintiff and in front of the entire group and again insisted "so where were you?" in an accusatory manner.  Although Plaintiff was reluctant to disclose a private matter involving a sensitive personal health issue in front of numerous colleagues, despite his embarrassment he felt he had no choice but to reveal in front of everyone that he had been in the bathroom.  Then, instead of accepting Plaintiff's answer and moving on with the meeting,

Defendant Rickoff repeated "the bathroom…hhmm," clearly implying in front of the assembled group that Plaintiff was being untruthful.

50.     Deeply distressed and humiliated, Plaintiff sent an email later that evening to Defendant Mendiola beseeching him to "please speak with [Defendant Rickoff] about putting an end to his mistreatment of me" and citing his fear of further retaliation from Defendant Rickoff.

51.     Defendant Mendiola completely ignored Plaintiff's email, despite his undoubted knowledge of and ultimate responsibility for promulgating and enforcing the Company's equal opportunity and non-discrimination policies and disciplining offending employees as the Director of HR for the entire JBS Greeley Beef Plant.

52.     By doing nothing whatsoever to put an end to Defendant Rickoff's repeated attempts to undermine, harass, belittle, humiliate, and otherwise treat Plaintiff less favorably than the non-Muslim and primarily white and Latino employees, Defendants Mendiola and JBS once again continued to tolerate and ratify his harassment and discriminatory and retaliatory treatment of his subordinate.

***In Addition To Singling Plaintiff Out For Discrimination And Retaliation On The Basis Of His Religion, Race, Color, Ethnicity, Ancestry, Alienage And/Or National Origin, Defendant Rickoff Also Engaged In Further Discrimination Against Other Muslim, Arab, Berber, Moroccan, Somali And Other African Employees at the Plant***

53.     As a direct and foreseeable consequence of Defendants Mendiola's and JBS's utter failure to ever meaningfully investigate, discipline or take any corrective action whatsoever or even to take Plaintiff's complaints seriously, Defendant Rickoff clearly received the message that *even at the top levels of its own HR department*, JBS tolerated, ratified and rewarded discrimination against Muslims, Arabs, Berbers and employees of Moroccan, Somali, Sudanese or other African national origin on the basis of their perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.  Sadly, this is not surprising in light of JBS's

long-standing history of animus, harassment, discrimination and retaliation against these and other minority populations, discussed below.  By permitting the highest level manager and director of HR to openly discriminate, retaliate, harass and denigrate members of these protected groups, Defendants sent the message to the entire plant that its employees were free to harass, abuse and treat members of these groups less favorably than other employees.  Most insidiously, Defendants' actions telegraphed to the entire plant that the Company's anti-discrimination policies were nothing more than pieces of paper that would not be enforced and that any complaints would not be taken seriously and were likely to lead to retaliation and possible termination.  Certainly, Defendant Rickoff unapologetically sent this message loud and clear to Plaintiff and others, knowing full well he would face no consequences or discipline from Defendants Mendiola, JBS or anyone else.

54.     On one such occasion during the spring of 2018, Defendant Rickoff terminated a Muslim employee of Somali origin. When Plaintiff asked Defendant Rickoff why he was terminating this employee, Defendant Rickoff boasted "I'm doing my share of making America great again!" Plaintiff was deeply disturbed by Defendant Rickoff's words because he understood that Defendant Rickoff was brazenly admitting that he terminated an employee on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin – and reasonably feared that he might be next.

55.     Later that spring, on or about March 28, 2018, Plaintiff and another Moroccan employee, Abdelilah Karim, a Fabrication Superintendent, were speaking Moroccan, their native language which is a mix of Arabic, Berber and French.  At some point, Defendant Rickoff walked by and overheard the two colleagues speaking a foreign language.  With obvious animus, Defendant Rickoff barked at them "If you're going to speak that blah-blah-blah, speak it in

Africa!"  Plaintiff and Mr. Karim exchanged looks in disbelief, but were too shocked by

Defendant Rickoff's outrageous, derogatory and discriminatory remark implying they should

return to Africa because of their perceived or actual religion, race, color, ethnicity, ancestry,

alienage and/or national origin to respond.

56.     By this point, Plaintiff realized it would be futile to make any further complaints

to Defendant Mendiola or JBS corporate respecting Defendant Rickoff's discriminatory language

and conduct toward him and others in light of the fact that Defendants had entirely ignored

Plaintiff's prior complaints and had taken no corrective action or discipline with respect to

Defendant Rickoff.  Plaintiff did not report these incidents because he felt he had no one to turn

to at JBS who would take his complaints seriously and he reasonably feared further retaliation.

***Defendant Mendiola Denied Plaintiff His 2017 Bonus And Gave Him His First-Ever
Disciplinary Write-Up As A Pretextual Justification For Setting Plaintiff Up For Termination
On The Discriminatory Basis of His Religion, Race, Color, Ethnicity, Ancestry, Alienage
And/Or National Origin***

57.     Defendant Rickoff's relentless efforts to throw Plaintiff under the bus so he could

get him in trouble with Defendant Mendiola, the HR Director, finally paid off on March 9, 2018.

On that day, Director Mendiola called Plaintiff into his office; informed him he would not be

receiving his annual bonus for 2017 and that he was the only employee in the HR department

who was not receiving a bonus; and presented Plaintiff with his first-ever disciplinary write-up *in

his entire professional career.*  This trumped-up disciplinary write-up referenced vague and

subjective purported issues with quality assurance and safety and mentioned the alleged need for

Plaintiff to "push back" with other employees – even though a number of Plaintiff's reviewers in

his 2017 Performance Review just two months earlier had specifically applauded Plaintiff's

decisiveness, referenced his "strong will" and noted that "[Plaintiff] is not afraid to express his

opinions, and even if disagreeing in the moment, he is willing to listen and discuss differences of

opinion." In fact, Plaintiff had a widespread reputation that while he always respectfully listened to others and saw the big picture, he was known to express strong opinions with respect to employee matters. Plaintiff declined to sign this trumped-up disciplinary statement because he apprehended that Defendants Mendiola and/or Rickoff concocted it to build a pretextual record in order to terminate him on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and in retaliation for the complaints he had made regarding this discrimination and retaliation. He understood that his termination was Defendants' ultimate intention. Despite his hard work, Plaintiff, the only Muslim, Arab and Berber employee of Moroccan national origin in the entire HR department, was again being treated less favorably than his non-Muslim, primarily white and Latino HR colleagues, all of whom received their bonuses for 2017.

58.     Later that month, Defendant Rickoff removed Plaintiff's name from the JBS phone directory and replaced it with Martha Holstein, the non-Muslim, white American employee whom he was grooming to replace Plaintiff at the earliest opportunity.

59.     By this point, Plaintiff was so emotionally distressed and experiencing severe anxiety due to Defendants' harassment, discrimination and retaliation against him that he sought the help of a medical professional, who prescribed him medication for his anxiety. This was the very first time in Plaintiff's life that he ever required medication for anxiety or for any mental or emotional condition. Unfortunately, when Defendant JBS abruptly cut off his health insurance upon his termination, discussed below, Plaintiff was no longer able to continue taking the mediations he needed to combat his distress and anxiety in relation to Defendants' relentless harassment.

### *Defendant JBS's Wrongful, Retaliatory Termination of Plaintiff*

60.     Having successfully fabricated a pretextual disciplinary record for Plaintiff, Defendants Mendiola and Rickoff finally accomplished their long-standing design to terminate Plaintiff on the basis of their ongoing discrimination and retaliation by making false accusations against him.

61.     On or about April 5, 2018, Defendants Mendiola and Rickoff separately gave Plaintiff separate specific instructions to go to the Fabrication office to conduct an investigation with a Burmese employee on the Fabrication floor.  Following their directions, at approximately 5:45pm that day, Plaintiff headed to the Fabrication office to begin this investigation.  Upon arriving, he entered the room in the Fabrication office that was commonly used to conduct investigations, where he found Defendant Rickoff.  Inside the room, Plaintiff saw the Burmese employee whom Defendants Rickoff and Mendiola earlier had instructed him to investigate, along with two union representatives.  Doing as he was told, he sat down at the end of the room to engage in the investigation, which based on Defendant Mendiola's and Defendant Rickoff's earlier directions he understood he was supposed to conduct.  Plaintiff knew that this Burmese employee, Jalal Hussein, often had disciplinary issues and thus he reasonably believed this was the employee he had been tasked with investigating.  Much to his surprise, Defendant Rickoff asked him to leave the room.  Confused in light of Defendant Rickoff's earlier instructions, Plaintiff inquired why Defendant Rickoff now wanted him to leave the investigation he had just asked him to conduct.  Defendant Rickoff declined to provide a reason, and Plaintiff explained to him that this was an investigation involving an incident which occurred on the B Shift, and per Defendant Mendiola's specific instructions, he was required to be fully involved in all B Shift HR investigations and that failure to do so would lead to serious consequences.

62.     Defendant Rickoff again declined to provide any explanation and instead got up, stating that he was going back to the HR office. He and the two union representatives left the room and the Burmese employee, Mr. Hussein, who was walking out right behind them suddenly closed the door and came back running to Plaintiff and saying "Bai ["Brother" in Burmese] I scared, Bai I scared" in an agitated manner because he was a Rohingya minority and was terrified that if he lost his job he would be deported to Burma, where violent ethnic cleansing against members of his family and other Rohingya was then occurring.  This entire interaction lasted less than 30 seconds and Plaintiff never got up from the end of the table where had had sat down to open or close the door.  At that point, there was a knock on the door, whereupon Plaintiff asked Mr. Hussein to please open the door and follow the others to the HR office.  Mr. Hussein quickly opened the door and left with Defendant Rickoff and the two union representatives for the HR office.  When Mr. Hussein opened the door, Defendant Rickoff clearly observed that Plaintiff was still sitting in the same spot at the table at the back end of the room and had not gotten up to open or close the door.

63.     Contrary to Defendant Rickoff's false accusations, Plaintiff never closed the door of the Fabrication room and remained seated at the table the entire time.  Instead, he asked Mr. Hussein to open the door and proceed to the HR office with Defendant Rickoff immediately after Mr. Hussein unexpectedly closed the door and ran back to Plaintiff out of fear of losing his job. At all times relevant to this Complaint, Plaintiff was following the specific directions of Defendant Mendiola, who in his pretextual disciplinary write-up less than a month earlier had emphasized that he must be involved in all B Shift matters and "push back" when necessary in order to make sure he was always involved.  Plaintiff was aware that there were no company policies that prevent the B Shift supervisor from engaging in an investigation relating to events

25

that occurred on the B Shift, particularly as Plaintiff was the only HR Supervisor staffed on the B Shift and had been told by the HR Director, Defendant Mendiola, that it was imperative for him to be involved in all B Shift HR matters. When Plaintiff explained all this to Defendant Rickoff, he did so in an entirely professional, respectful manner, while holding firm to Defendant Mendiola's orders, as was his custom and practice.  Contrary to Defendant Rickoff's false accusations, Plaintiff did not raise his voice or "yell" at any time.  As far as Plaintiff knew, this was the investigation he had been told to conduct, particularly as he was aware that Mr. Hussein was constantly getting in trouble.  Defendant Rickoff never informed him otherwise, which he easily could have done and instantly cleared up the mix-up respecting the subject of this investigation.  Unfortunately, this was just another example of Defendant Rickoff's tendency to withhold crucial information from Plaintiff in an effort to set him up for trouble and disciplinary action.

64.     Plaintiff immediately sent a text message to Defendant Mendiola to inform him of the situation.  Defendant Mendiola asked Plaintiff to come to his office, which he did.  When he arrived in Defendant Mendiola's office, he explained exactly what happened.

65.     As Plaintiff later learned, Defendant Rickoff had made a written statement that was at completely odds with the facts and accused Plaintiff of acting inappropriately and saying things had had not said.  In his statement, among other untrue allegations, Defendant Rickoff claimed that Plaintiff "yelled" and "shut the door" as Defendant Rickoff and the two union representatives were leaving the Fabrication room where the investigation in question was being conducted.  He also falsely alleged that Plaintiff locked the door, which was demonstrably false – it was Mr. Hussein who unexpectedly shut and locked the door, without warning or Plaintiff's permission.  Defendant Rickoff also falsely claimed that he tried to open the door several times,

continued knocking loudly and that Plaintiff refused to open it for two to three minutes. Defendant Rickoff indicated the investigation in question involved a different employee, Abdelilah Karim, in relation to his treatment of Fabrication employees, rather than Mr. Hussein, the Burmese employee. However, because Plaintiff came upon Mr. Hussein being interviewed in the investigation room, it was natural and reasonable that he believed this was the investigation of Mr. Hussein he had been asked to conduct by none other than Defendant Rickoff himself. Unfortunately, Defendant Rickoff failed to convey this crucial information to Plaintiff at any time, even though he easily could have done so and promptly cleared up the mix-up. Defendant Rickoff's false allegations were knowingly and intentionally contrary to fact.

66.     The next day, on or about April 6, 2018, Plaintiff was suspended for "inappropriate conduct pending investigation," and on or about April 11, 2018 he received a letter of termination from Defendant Mendiola informing him that his employment was being terminated. Defendant JBS did not provide a reason for his termination nor indicate whether it had conducted any investigation. To the extent that Defendant Mendiola had conducted any investigation at all, apart from taking Defendant Rickoff's false accusations as fact, Plaintiff never requested to provide a written statement nor was he informed of the findings of any purported investigation at any time. Defendants' purported reasons for their wrongful termination of Plaintiff is mere pretext for illegal discrimination and retaliation.

67.     Defendants' wrongful, discriminatory and retaliatory termination of Plaintiff on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and in retaliation for his protected complaints regarding Defendant Rickoff's relentless harassment, discrimination and retaliation against him have caused Plaintiff severe economic and non-economic damages.

27

68.     It is notable that as part of Plaintiff's later claim for Unemployment Insurance benefits, a Deputy for the Colorado Department of Labor credited Plaintiff's account of the events of April 5, 2018, and concluded as part of his official administrative investigation:

> The employer discharged the [Plaintiff] because [Plaintiff] violated company policy and interfered with the investigation. However, the deputy is more persuaded by [Plaintiff's] statement that he was assigned to the case to investigate and he did not act as employer accused him to act as. The deputy is persuaded that [Plaintiff] performed his job as required and he was falsely accused of interfering with the investigation. The deputy is persuaded that [Plaintiff] is not at fault for the reason for the job separation and thus the benefit attributed from this employer is allowed.

Although Defendant JBS appealed Plaintiff's award of Unemployment Insurance benefits and the deputy's decision was later reversed on appeal by Defendant JBS, the only reason Plaintiff ultimately lost his Appeals Hearing is that he was in Morocco visiting his ill mother and therefore did not receive notification that the Company had appealed his award of unemployment insurance benefits and was unable to attend the hearing.  Upon Plaintiff's appeal, the Hearing Officer's decision is currently being reviewed by the Colorado Department of Labor and Employment's Industrial Claims Appeals Office.

### *Defendant JBS Operates Pursuant To A Long-Standing And Firmly-Established Custom, Policy And Practice Of Harassment, Discrimination And Retaliation Against Muslim Employees of All Races, Ethnicities and National Origins*

69.     Defendant JBS is a U.S. wholly owned indirect subsidiary of the largest beef and pork processing company in the world.  Upon information and belief, the JBS Greeley Beef Plant comprises approximately 3,300 employees, who represent a veritable melting pot of races, ethnicities, nationalities and religious beliefs and hail from many parts of the world and collectively speak approximately thirty-six (36) languages.  Yet not all positions within the Company are distributed equally with respect to employees of different religions, races, ethnicities and/or national origins.  As described herein, aside from one African-American

employee, the Human Resources department is comprised entirely of non-Muslim, Latino and white, American-born employees.  The majority of the beef workers who do the physically punishing work of slaughtering the cows, carving up the carcasses, processing the beef from head to tail and packaging it for shipment is performed primarily by low-wage Latino employees and Muslim employees of a variety of races, ethnicities and national origin; very few white Americans perform this hard labor.  The JBS corporate office and the top manager positions at the JBS Greeley Beef Plant, however, are dominated by a majority of white, American-born employees, who have the greatest earning power and whom Defendant JBS has placed in positions of authority over the other numerous minority beef workers, including but not limited to Muslim employees of Moroccan (including Arab and Berber race, ethnicities and/or ancestry), Somali (including Somali race, ethnicity and/or ancestry), Sudanese (including Arab and several other race, ethnicities or ancestry) and other races, ethnicities, or ancestries of African national origin, as well as Latino employees of Mexican and other Latin American national origin.

70.     This unequal distribution of authority and earning power at the JBS Greeley Beef Plant is no accident – it is both a cause and effect of Defendant JBS's standard operating procedure of harassment, discrimination and retaliation against its Muslim, Arab, Berber, Moroccan, Somali, Sudanese and other employees of African national origin.  The effects of this uneven distribution of authority and earning power with respect to different racial, ethnic and religious groups reverberate throughout the entire JBS Greeley Beef Plant, creating conditions ripe for institutional bias, abuses of authority, the creation of certain favored and disfavored groups, and harassment, discrimination and retaliation along religious, racial, ethnic and/or national origin lines.  This context is necessary for understanding the structural reasons that Defendant JBS has such a deep-seated, long-standing and insidious custom, policy and practice

of harassment, discrimination and retaliation against Muslim, Arab and Berber employees of Moroccan, Somali, Sudanese and other African national origin, among others.  It is impossible to truly appreciate why Defendants' treatment of Plaintiff and others has been so damaging not just to Plaintiff personally but also to all JBS employees without understanding this power structure and the history of the intersection of religious, racial, ethnic and/or national origin-based tensions, discrimination and retaliation at the JBS Greeley Beef Plant.

71.     Upon information and belief, in approximately 2006-2008, Defendant JBS experienced a series of workplace immigrations raids by U.S. Immigrations and Customs Enforcement ("ICE") upon its then primarily Latino beef worker employee populations, some of whom were undocumented and were deported to their countries of origin from the JBS Greeley Beef Plant as well as other JBS meat processing facilities.  Following the loss of a large number of its Latino workers, upon information and belief, Defendant JBS began hiring Muslim, Somali employees in approximately 2008.  Since that time, Defendant JBS has continued hiring beef workers from among new waves of immigrant populations, which more recently have included a number of Moroccan, Sudanese and other African employees, among others.

72.     During Ramadan 2008, which occurred in the month of September that year, Defendant JBS engaged in a pattern and practice of failure to accommodate the religious needs of its new Muslim (at that time, primarily Somali) employees, and harassed, discriminated and retaliated against them in a variety of ways, denying its Muslim employees prayer breaks and subjecting them to a hostile work environment.  Specifically, when the Muslim, Somali employees at the JBS Greeley Beef Plant requested to take brief prayer breaks five times daily as required by Islam and requested breaks from the production line to pray and break their fast at sundown as required during Ramadan, Defendant JBS refused to accommodate their requests

and instead retaliated against the Muslim employees by suspending and terminating many of them en masse.

73.     In 2010, the Equal Employment Opportunity Commission ("EEOC") brought suit against Defendant JBS on behalf of a class of several hundred Muslim, Somali former JBS employees alleging that Defendant JBS engaged in a pattern and practice of discrimination, retaliation, hostile work environment and failure to accommodate the plaintiffs' religious needs. *See EEOC v. JBS USA, LLC, d/b/a JBS Swift & Company*, Civil Action No. 10-cv-02103-PAB-KLM.  In the Court's Order on Summary Judgment, the Court found that "there is sufficient evidence upon which to conclude that JBS made at least six different discriminatory decisions between September 5 and September 10, 2008, *which could lead a factfinder to conclude that discrimination was JBS's standard operating procedure*[.]" (emphasis added) [Order on Summary Judgment, July 17, 2015, at p. 1241].  These pattern and practice claims were tried before the Court in the summer of 2017 and a ruling is currently pending.

74.     Whether or not the Court ultimately finds in that particular case that harassment, discrimination and retaliation against its Muslim employees was Defendant JBS's standard operating procedure at the JBS Greeley Beef Plant in 2008, unfortunately, such harassment, discrimination and retaliation continues to be its standard operating procedure toward its Muslim employees today, who comprise a variety of religions, races, color, ethnicities, ancestries, alienage and/or national origins, including but not limited to Arab, Berber, Moroccan, Somali, Sudanese and other employees of African origin, among others.  While Defendant JBS has made commendable efforts to reasonably accommodate the religious needs of its Muslim employees during Ramadan, clearly it has not gone nearly far enough to meaningfully send and enforce the

message that such harassment, discrimination and retaliation will not be tolerated, or take complaints seriously, conduct meaningful investigations and discipline culpable employees.

75.    The illegal ways in which Defendants have treated Plaintiff encapsulates the very reason that Defendant JBS has not changed its standard operating procedure with respect to its Muslim employees of all ethnicities and national origins.  When harassment, discrimination and retaliation against Muslim employees of all races, colors, ethnicities, ancestry, alienage and national origin is tolerated, ratified and even rewarded by the Director of Human Resources, not to mention the JBS corporate office; when more qualified Muslim employees are passed over for promotion while less qualified non-Muslim, white American employees are promoted instead; and when complaints are not taken seriously, ignored or dismissed entirely, investigations are not meaningfully conducted or not conducted at all, and no consequences befall those who engage in such conduct *even at the top levels of its own HR department* – it matters little how much paper the Company wastes on printing anti-discrimination or equal opportunity policies because in all practicality such policies are known to be toothless and meaningless because JBS employees are fully aware they are not actually enforced.  As an entirely foreseeable consequence, employees throughout the entire plant feel free to harass, discriminate and retaliate against their Muslim colleagues because they have received the message loud and clear that this is the Company's standard operating procedure and they know they will not face any discipline – and, like Defendant Rickoff, may even get promoted!  Similarly, Defendants' illegal treatment of Plaintiff sends the message to all Muslim employees that making complaints will only lead to retaliation, and possibly, termination.

76.    Upon information and belief, Defendant JBS terminated at least one other Muslim, Arab and/or Berber and Moroccan employee under circumstances suggesting

discrimination and retaliation within days of its wrongful, illegal and entirely pretextual termination of Plaintiff.

77.     At all times relevant to this complaint, Defendants Mendiola and Rickoff were operating in accordance with and pursuant to Defendant JBS's custom, policy and practice of discrimination and retaliation against its Muslim employees of all races, color, ethnicities, ancestries, alienage and/or national origins, including but not limited to Arab, Berber, Moroccan, Somali, Sudanese and other employees of African national origin.

78.     As a result of Defendants' unlawful, discriminatory and retaliatory conduct, Plaintiff has suffered severe economic and non-economic damages.

## VI. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.
Discrimination – Religion, Race, Color, Ethnicity, Ancestry, Alienage and/or National
Origin, Failure to Promote and Hostile Work Environment
(Against Defendant JBS)**

79.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

80.     As a Muslim of Arab and Berber race, color, ethnicity, ancestry and/or alienage and of Moroccan national origin, Plaintiff is a member of multiple protected classes under Title VII.

81.     Defendants treated Plaintiff less favorably than his similarly situated non-Muslim, non-Arab or Berber and non-Moroccan counterparts.  Defendants subjected Plaintiff to adverse treatment in the terms and conditions of his employment because of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, including but not limited

to denial of promotions, discriminatory terms and conditions of employment, hostile work environment and termination, as detailed herein.

82.     At all pertinent times, Plaintiff performed the functions of his job competently and was more than qualified for promotions.

83.     Despite his superior qualifications and exemplary job performance, Defendants refused to promote Plaintiff, in whole or in part, because of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin.  Instead, Defendants promoted a white American non-Muslim employee to the position for which Plaintiff was qualified.

84.     Plaintiff's perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin was a motivating factor in Defendants' refusal to promote him.  Any reasons asserted by Defendants for refusing to promote Plaintiff are mere pretext for illegal discrimination.

85.     Plaintiff's perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin was a motivating factor in Defendants' decision to terminate Plaintiff. Defendants' asserted reasons for terminating Plaintiff are mere pretext for illegal discrimination.

86.     Defendant JBS is liable for the acts and/or omissions of its agents and employees.  Defendant JBS, either directly or by and through its agents, discriminated against Plaintiff on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin and directly and proximately caused him severe injuries, damages, and losses.

87.     Defendant JBS's acts and conduct were committed with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

## SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983 Race, Color, Ethnicity, Ancestry and/or Alienage Discrimination under 42 U.S.C. § 1981**
**(Against All Defendants)**

88.     Plaintiff hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

89.     Title 42 U.S.C. § 1983 ("Section 1983") is the jurisdictional vehicle appropriate to obtain relief against a state actor for a violation of Title 42 U.S.C. § 1981 ("Section 1981").

90.     Section 1981 provides, in pertinent part:

(a)     All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .

(b)     For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

(c)     The rights protected by this section are protected against . . . impairment under color of State law.

91.     Plaintiff is a Muslim, Arab and Berber male of Moroccan race, color, ethnicity, ancestry and/or alienage and is thus a member of a protected class under Section 1981.

92.     Plaintiff is and has at all times been qualified to perform his job responsibilities, and he has performed them at all times at least satisfactorily.

93.     Defendants denied Plaintiff the protections against race, color, ethnicity, ancestry and/or alienage discrimination provided by Section 1981 in the terms and conditions of his employment by denying him the same benefits, privileges, and terms and conditions of his contractual employment relationship that his white and/or Latino counterparts enjoyed, and by terminating him.

94.     Plaintiff's perceived or actual race, color, ethnicity, ancestry and/or alienage was a motivating factor for Defendants' actions.

95.     Defendants Mendiola's and Rickoff's discrimination against Plaintiff on the basis of his perceived or actual race, color, ethnicity, ancestry and/or alienage caused Defendant JBS to terminate Plaintiff.

96.     Defendants Mendiola and Rickoff are not entitled to qualified immunity for the complained of conduct.  Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants' positions knew or should have known, as described more fully herein.

97.     Defendant JBS engaged in race, color, ethnicity, ancestry and/or alienage discrimination against Plaintiff pursuant to its custom, policy, or practice to promote and otherwise treat more favorably white and/or Latino and/or other employees versus Arab, Berber, Moroccan, Somali, Sudanese and/or other African employees.

98.     Defendants' conduct was willful, wanton and in reckless disregard of Plaintiff's federally protected rights, and was the proximate cause of significant injuries, damages and losses that he incurred.


**THIRD CLAIM FOR RELIEF**

**Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Retaliation (Against Defendant JBS)**

99.     Plaintiff hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

100.     Plaintiff believed in good faith that Defendants discriminated against him on

the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, as described herein.

101.    Plaintiff opposed Defendants' discriminatory treatment by reporting it to Defendants Mendiola and JBS.

102.    As a direct result of Plaintiff's opposition to activities prohibited by Title VII, Defendants subjected Plaintiff to adverse treatment, including but not limited to requiring him to work in a hostile work environment which materially and adversely affected the terms and conditions of his employment, subjecting him to disparate treatment because of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, failing to promote him and subjecting him to efforts to adversely affect the terms and conditions of his employment, terminating him, and other discriminatory practices.

103.    Defendants' retaliation against Plaintiff arose out of, and was like and related to, the discrimination Plaintiff opposed while he was employed, both to Defendants Mendiola and Defendant JBS.

104.    Defendant JBS is liable for the acts and omissions of its agents and employees. Defendant JBS, either directly or by and through its agents, retaliated against Plaintiff and directly and proximately caused him severe injuries, damages, and losses.

105.    Defendant JBS's conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiff within the meaning of Title VII.

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Retaliation under 42 U.S.C. § 1981
### (Against All Defendants)

106.    Plaintiff hereby incorporates all allegations contained in this Complaint as though

37

fully set forth herein.

107.    Plaintiff engaged in activities and speech in opposition to employment practices prohibited by Section 1981 by objecting to and reporting discrimination to Defendants Mendiola and JBS.

108.    Defendants treated Plaintiff more adversely than his similarly situated counterparts who did not voice their opposition to Defendants' discrimination.

109.    Because of Plaintiff's objections to discrimination, Defendants subjected him to adverse treatment, including but not limited to requiring him to work in a hostile work environment which materially and adversely affected the terms and conditions of his employment, failing to promote him, subjecting him to disparate treatment because of his perceived or actual race, color, ethnicity, ancestry and/or alienage, subjecting him to efforts to adversely affect the terms and conditions of his employment, terminating him, and other discriminatory practices.

110.    Defendant Mendiola's and Defendant Rickoff's retaliation against Plaintiff caused Defendant JBS to terminate Plaintiff.  Plaintiff's termination constituted the official policy and standard operating procedure of Defendant JBS within the meaning of Section 1983.

111.    Defendants Mendiola and Rickoff are not entitled to qualified immunity for the complained of conduct.  Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants' positions knew or should have known, as described more fully herein.

112.    Defendant JBS retaliated against Plaintiff pursuant to its custom, policy, or practice to adversely treat employees who voice opposition to discrimination and/or harassment.

113.    Defendants' conduct was engaged in with malice or with reckless indifference to

Plaintiff's federally protected rights within the meaning of Sections 1981 and 1983.

114.    Defendants' retaliation against Plaintiff was the direct and proximate cause of his severe injuries, damages, and losses.

## FIFTH CLAIM FOR RELIEF

### Outrageous Conduct/ Intentional Infliction of Emotional Distress
### (Against Defendants Rickoff and JBS)

115.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

116.    Defendant Rickoff's conduct in verbally assaulting Plaintiff with the religious, racial and/or xenophobic epithet "you freaking terrorists!" because of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin was so outrageous and so extreme that reasonable members of the community would regard such behavior as atrocious.

117.    In blaming Plaintiff for the recently-enacted Muslim Ban and degrading Plaintiff as a terrorist on the basis of his perceived or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin, Defendant Rickoff engaged in this conduct recklessly or with the intent of causing Plaintiff severe emotional distress.

118.    Defendant JBS is liable for the conduct of its agents, including Defendant Rickoff.

119.    By participating in the retaliatory campaign of harassment, enhanced scrutiny and inaccurate and largely fabricated disciplinary actions against Plaintiff and orchestrating his termination – all in retaliation, in part, for Plaintiff's opposition to Defendant Rickoff's outrageous statement and other discrimination and retaliation on the basis of Plaintiff's perceived

or actual religion, race, color, ethnicity, ancestry, alienage and/or national origin – Defendants intentionally, willfully and wantonly caused Plaintiff severe emotional distress.

120.   As a direct and proximate result of Defendants' outrageous conduct, Plaintiff has sustained severe economic damages, emotional distress and mental anguish, and has suffered other injuries, damages and losses.

WHEREFORE, Plaintiff Kacem M. Andalib respectfully requests that this Court enter judgment in his favor and against Defendants JBS, Mendiola and Rickoff, and award him all relief as allowed by law, including, but not limited to the following:

a.   Declaratory, injunctive, and other equitable relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.   Punitive/exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e.   Liquidated damages for all claims as allowed by law in an amount to be determined at trial;

f.   Pre-judgment and post-judgment interest at the highest lawful rate;

g.   Attorney's fees and costs;

h.   The implementation of policy changes by Defendant JBS designed to prevent future harassment, discrimination and retaliation against Muslims of all races, ethnicities and national origins, and other minorities; and

i.   Such further relief as allowed by law or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**.

DATED this 21st day of August 2018.

CIVIL RIGHTS & EMPLOYMENT LAW ADVOCATES, LLC

*s/ Eudoxie Dickey*
Eudoxie (Dunia) Dickey
2300 Walnut St. #123
Denver, CO 80205
(303) 395-9150
CivilRightsAdvocatesLLC@gmail.com

*Attorney for Plaintiff*